**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

JOEL I. SHER, ET AL. :
:
v. : Civil No. CCB-11-2796
:
GOLDMAN SACHS :

**MEMORANDUM**

Plaintiff, Joel I. Sher ("Trustee"), in his capacity as Chapter 11 Trustee for TMST, Inc., f/k/a/ Thornburg Mortgage, Inc. ("TMST"), has filed suit against Goldman, Sachs & Co. ("Goldman Sachs"). The suit arises from a repurchase agreement between the parties whereby Goldman Sachs financed TMST's acquisition of mortgage-backed securities. The Trustee alleges, among other things, that Goldman Sachs manipulated mortgage-backed security pricing, issued improper margin calls, and liquidated TMST assets in bad faith. The Trustee now asserts claims for breach of contract and breach of the covenants of good faith and fair dealing. (Complaint, ECF No. 9.)[1]

Now pending before the court are Goldman Sachs's motions to compel arbitration and to stay or dismiss the action or, in the alternative, to dismiss the complaint. (ECF Nos. 1, 24.) The issues have been fully briefed, and the court finds oral hearing unnecessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, the court concludes, first, that the arbitration clause is valid, and second, that the parties have agreed to have the threshold question of the

[1] The suit was initially filed in the United States Bankruptcy Court for the District of Maryland. (Case No. 09-17787.) The court issued an order on January 20, 2012, granting Goldman Sachs's motion to withdraw the reference. (ECF Nos. 1, 7.)

arbitrability of TMST's claims decided by the arbitrator. Accordingly, the court will grant Goldman Sachs's motion to submit the matter to arbitration on the question of arbitrability and stay the action pending arbitration.

**Background**

This action arises from TMST's dealings with Goldman Sachs as one of several financial institutions that provided financing for TMST's acquisition of mortgage-backed securities. TMST is a financial institution incorporated under the laws of Maryland. Goldman Sachs is a registered broker-dealer engaged in the purchase and sale of securities. TMST opened an account with Goldman Sachs in May 1997. In 2002, TMST entered into an agreement with Goldman Sachs which enabled TMST to purchase mortgage-backed securities by selling assets to Goldman Sachs and agreeing to buy them back at a later date for a higher price. In the course of their business relationship, TMST and Goldman Sachs entered into two written agreements relevant to this dispute – a Corporate Account Agreement ("CAA") in May 1997 and a Master Repurchase Agreement ("MRA") in August 2002. (ECF No. 25, Exh. 5; ECF No. 9, Exh. 1.)

The claims under consideration in this action arise from the terms of the MRA, which TMST alleges that Goldman Sachs breached. At issue is whether the arbitration provision of the 1997 CAA compels arbitration with respect to TMST's claims against Goldman Sachs. The parties dispute whether the MRA vitiated the arbitration provision in the CAA and whether the court or the arbitrator should determine the arbitrability of TMST's claims. The parties also take contrary positions on the substantive question of whether arbitration should be compelled with respect to TMST's repurchase-related claims.

TMST contends the MRA superseded and vitiated the arbitration provision in the CAA. According to TMST, "[t]he MRA constitutes a separate, fully-integrated contract" enacted

subsequent to the CAA. (ECF No. 32, p. 17.) TMST points to language in the MRA providing that "[t]his Agreement shall supersede any existing agreements between the parties containing general terms and conditions for repurchase transactions" as evidence that the CAA is invalid with respect to matters covered by the MRA. (ECF No. 9, Exh. 1, § 14.) TMST also notes that the MRA does not incorporate the CAA by reference or provide that its terms apply. Accordingly, TMST contends that the CAA and MRA are collateral to one another and the provisions of the CAA cannot apply to a dispute arising from the MRA.[2]

As to the appropriate forum for deciding arbitrability, TMST argues the court must decide whether arbitration is compelled with respect to its claims against Goldman Sachs. TMST contends the arbitration provision of the CAA does not express the parties' intent for an arbitrator to determine arbitrability, even if it were valid and applicable. TMST notes that the Federal Arbitration Act envisions courts, not arbitrators, making the threshold determinations about whether a matter is arbitrable. 9 U.S.C. § 3. Moreover, TMST argues that Goldman Sachs cannot overcome the presumption that arbitrability is a matter for judicial determination. *See AT&T Techs, Inc. v. Communications Workers of Am.*, 475 U.S. 643, 649 (1986) ("Unless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator."). TMST regards the broad language of

[2] TMST also argues that the CAA does not apply to its particular claims which arise under the MRA. (ECF No. 32, p. 13-16.) According to TMST, the CAA "was not a negotiated document intended by the parties to be a general overarching umbrella agreement governing all present and future relations between them." (*Id.* at 14.) TMST observes that the CAA only lists two account numbers, neither of which is the account number listed in the MRA. TMST also notes that the CAA does not refer at all to the repurchase transactions which are the subject of this suit. TMST argues the arbitration provision of the CAA is limited by its very text to controversies "arising out of or related to this agreement, the transactions contemplated hereby, or the accounts established hereunder." By TMST's account, its claims against Goldman Sachs lack the nexus to the CAA required for the arbitration provision to apply. For the reasons explained herein, the question of the arbitrability of TMST's particular claims will be reserved for determination by the arbitrator. This ruling addresses only the validity of the arbitration provision and the appropriate forum for deciding arbitrability.

the CAA's arbitration language as merely a "boilerplate recitation[ ] of the scope of arbitrable matters," which does not evince the parties' intent to bypass judicial determination of arbitrability. (ECF No. 32, p. 12.)

Goldman Sachs, by contrast, maintains that the arbitration clause in the CAA is valid and clearly evinces the parties' intent for an arbitrator to decide threshold matters of arbitrability. Goldman Sachs contends, in the alternative, that if the court does not submit the question of arbitrability to the arbitrator, the court should compel arbitration of TMST's claims. According to Goldman Sachs, the CAA represents the parties' agreement to arbitrate all disputes related to their business relationship. In support of its argument, Goldman Sachs points to the broad language of the CAA itself. The agreement states that the parties "hereby agree to the following with respect to *any* of [TMST's] accounts with [Goldman Sachs] and *all transactions* with [Goldman Sachs]." (ECF No. 25, Exh. 5) (emphasis added). The contract's arbitration clause provides that "[a]ny controversy between [Goldman Sachs] . . . and [TMST] . . . arising out of or relating to this agreement, the transactions contemplated hereby, or the accounts established hereunder, shall be settled by arbitration." (*Id.*, § 13.) Goldman Sachs argues the CAA was intended to apply to the entirety of the parties' relationship and asserts that the MRA's complete silence as to arbitration demonstrates that it does not preclude arbitration. Moreover, Goldman Sachs notes that courts are instructed to "generously construe[]" parties' intentions in favor of arbitrability. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985).

With respect to the issue of who should determine arbitrability, Goldman Sachs argues the contract reflects a "clear[] and unmistakabl[e]" agreement between the parties to have the arbitrator decide arbitrability, as required under law. *AT&T Techs*, 475 U.S. at 649. Goldman

Sachs claims the language in the CAA providing that "any controversy" will be settled by an arbitrator dictates that arbitrability itself is to be determined by an arbitrator. Moreover, Goldman Sachs points to language in the CAA stating that arbitration will proceed "in accordance with the rules then obtaining to any one of the American Arbitration Association or The New York Stock Exchange, Inc., or any other exchange of which [Goldman Sachs is] a member, or the National Association of Securities Dealers, Inc. or the Municipal Securities Rulemaking Board, as [TMST] may elect." (ECF No. 25, Exh. 5, § 13.) Goldman Sachs asserts that all of these rules "contain provisions that have been held to empower the arbitrator to decide threshold issues of arbitrability." (ECF No. 37, p. 6.) Accordingly, Goldman Sachs argues that the CAA's incorporation of rules empowering an arbitrator to decide arbitrability constitutes sufficient evidence of the parties' intent to delegate the issue to the arbitrator.

**Discussion**

In determining arbitrability, courts first consider whether a valid arbitration agreement exists. Upon finding a valid agreement to arbitrate, the court must "determine *who* decides whether a particular dispute is arbitrable: the arbitrator or the court." *Peabody Holding Co., LLC v. United Mine Workers of Am., Int'l Union*, 665 F.3d 96, 101 (4th Cir. 2012) (emphasis in original). Only after "conclud[ing] that the court is the proper forum in which to adjudicate arbitrability" should the court "decide *whether* the dispute is, in fact, arbitrable." *Id.* (emphasis in original).

The Supreme Court has held that "arbitration is simply a matter of contract." *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995); *see also AT&T Techs*, 475 U.S. at 648. Therefore, "when deciding whether the parties agreed to arbitrate a certain matter

(*including arbitrability*), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts." *First Options*, 514 U.S. at 944 (emphasis added); *see also Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002) ("Whether a party agreed to arbitrate a particular dispute is a question of state law governing contract formation.").[3]

With respect to the validity of the arbitration agreement, New York courts have specifically considered whether a subsequent agreement containing a merger clause that makes no reference to arbitration operates to invalidate a broad arbitration provision in an earlier contract. *See Primex Int'l Corp. v. Wal-Mart Stores, Inc.*, 89 N.Y.2d 594, 601 (1997); *see also Remco Maintenance, LLC v. CC Management & Consulting*, 925 N.Y.S.2d 30, 32 ("[A]bsent a clear manifestation of contrary intent, a broad arbitration clause survives and remains enforceable for the resolution of disputes arising out of that agreement."). Courts have concluded that a subsequent agreement without reference to arbitration does not overcome the presumption of arbitration created by a broad arbitration provision in an initial agreement. *See Primex*, 89 N.Y.2d at 601; *see also Bank Julius Baer & Co., Ltd. v. Waxfield Ltd.*, 424 F.3d 278 (2d Cir. 2005).

In *Bank Julius Baer*, the parties entered into an initial contract providing that arbitration would apply to "any dispute, controversy or claim with regard to any agreement, the breach

---

[3] The CAA and the MRA both contain choice of law provisions providing that the agreements are governed by the laws of the State of New York. (ECF No. 25, Exh. 5, § 11; ECF No. 9, Exh. 1, § 16.) Both parties have acknowledged that New York state law applies to the interpretation of the arbitration agreement. (ECF No. 24, p. 22; ECF No. 32, p. 13.) In keeping with the *First Options* directive, this court will analyze the questions of arbitrability with reference to New York state law. This is consistent with the practices of other courts in determining the validity of arbitration clauses and the appropriate forum for deciding arbitrability. *See, e.g.*, *Grynberg v. BP P.L.C.*, 585 F. Supp. 2d 50, 55, n.2 (D.D.C. 2008) (applying New York law interpreting whether arbitrators or courts should arbitrate arbitrability); *Bell v. Cendant Corp.*, 293 F.3d 563, 566 (2d Cir. 2002) ("[T]he issue of arbitrability may only be referred to the arbitrator if there is clear and unmistakable evidence from the arbitration agreement, *as construed by the relevant state law*, that the parties intended that the question of arbitrability shall be decided by the arbitrator.") (internal quotations omitted, emphasis added).

thereof or any account or transaction." 424 F.3d at 282 (emphasis omitted). Shortly thereafter, the parties entered into another agreement providing that it "supersedes all prior agreements and understandings" between the parties. *Id.* The second agreement, like the MRA at issue in this case, did not incorporate the first agreement by reference or mention the issue of arbitration. Like TMST, the client opposed arbitration on the grounds that the merger clause in the subsequent agreement invalidated the initial agreement to arbitrate.

In reaching its conclusion, the court noted that the merger clause in the subsequent contract "acts only to require full application of the parol evidence rule to the *writing in question*" – not to void the initial arbitration agreement. *Id.* at 283 (emphasis added) (citing *Primex*, 89 N.Y.2d at 600). The court also noted that interpreting the merger clause in the subsequent agreement as invalidating the first agreement "would also lead to absurd results, such as expunging the account-opening agreements on which the [subsequent agreements] later rely." *Id.* More fundamentally, the court held that "[u]nder our cases, if there is a reading of the various agreements that permits the Arbitration Clause to remain in effect, we must choose it: [T]he existence of a broad agreement to arbitrate creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 284 (internal quotations omitted). Accordingly, the court concluded that the subsequent agreement did not vitiate the arbitration agreement and the broad arbitration agreement was valid. *Id.* at 285.

The logic of *Bank Julius* applies squarely to this case. The court finds that the CAA's arbitration provision is not voided by the MRA and is therefore valid.

*Forum for the Determination of Arbitrability*

Having determined that a valid arbitration agreement exists between the parties, the court now considers whether the arbitrability of TMST's claims is properly determined by the court or the arbitrator. *See Peabody Holding Co*, 665 F.3d at 101.

As TMST has noted, courts presume that questions of arbitrability are issues for judicial determination. *See Smith Barney Shearson Inc. v. Sacharow*, 91 N.Y.2d 39, 45 (1997) ("[W]e note the well-settled proposition that the question of arbitrability is an issue generally for judicial determination in the first instance."). The Supreme Court has held that "questions of arbitrability" – including "whether an arbitration clause in a concededly binding contract applies to a particular type of controversy" – are appropriate for courts. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002). The Court has also clarified, however, that parties may agree to have an arbitrator determine issues of arbitrability if they "clearly and unmistakably provide" so. *AT&T Techs*, 475 U.S. at 649. "Just as the arbitrability of the merits of a dispute depends upon whether the parties agreed to arbitrate that dispute, . . . so the question 'who has the primary power to decide arbitrability' turns upon what the parties agreed about *that* matter." *First Options*, 514 U.S. at 943 (emphasis in original).

Recognizing the presumption of judicial determination of arbitrability, the court nonetheless finds in this instance that arbitration is the appropriate forum to decide the threshold question of arbitrability because of the clear intent of the parties to so provide. The New York State court has found that parties "evinced a 'clear and unmistakable' agreement to arbitrate arbitrability as part of their alternative dispute resolution choice" primarily in two circumstances: (1) when the language of an arbitration agreement is so broad as to submit "any" controversy for arbitration, and (2) when the parties incorporated by reference arbitration rules which grant

arbitrators the power to determine arbitrability. *Sacharow*, 91 N.Y.2d at 46-47. In this case, both circumstances apply.

In *Sacharow*, the court found that language in an arbitration clause was so sweeping as to evince the parties' clear and unmistakable intent to submit the question of arbitrability for arbitration and overcome the presumption of judicial determination. There, the court considered language in the arbitration agreement providing that "any controversy . . . shall be resolved by arbitration." *Id.* at 40. The court characterized the arbitration provision as "plain and sweeping." *Id.* at 47. In reaching its holding, the court echoed the Second Circuit's observations in *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996), which examined a very similar arbitration clause. There, the Second Circuit concluded that the meaning of the clause was "plain indeed: any and all controversies are to be determined by arbitration. The wording is inclusive, categorical, unconditional and unlimited. The words 'any and all' are elastic enough to encompass disputes over . . . whether a claim is within the scope of arbitration." *Id.* at 1199. Accordingly, the *Sacharow* court, like the *Bybyk* court, held that the broad language of the arbitration clause constituted sufficient evidence of "the parties' intent and commitment to arbitrate the issue of arbitrability" to overcome the presumption of judicial determination of arbitrability. 91 N.Y.2d at 46.

Furthermore, in both *Sacharow* and *Bybyk*, the incorporation of arbitration rules which provide for arbitrators to decide issues of arbitrability was found to constitute further evidence of the parties' intent. In *Sacharow*, the court concluded that the incorporation of the arbitration rules of the National Association of Securities Dealers (NASD) into the parties' arbitration agreement reflected "a clear and unmistakable expression of their intent to leave the question of arbitrability to the arbitrators" because "language of the [NASD] Code itself commits all issues,

including issues of arbitrability . . . , to the arbitrators." *Id.* at 47 (quoting *Bybyk*, 81 F.3d at 1202); *see also id.* (incorporation of NASD rules would serve as evidence "that the parties intended to arbitrate the issue of arbitrability"). Courts have reached the same conclusion with respect to the incorporation of other bodies of arbitral rules. *See, e.g., Zachariou v. Manios*, 891 N.Y.S.2d 54, 55 (2009) ("Where there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the [American Arbitration Association] rules providing that the arbitration panel shall have the power to rule on its own jurisdiction, courts will leave the question of arbitrability to the arbitrators.") (internal quotations omitted).

In this case, which set of arbitration rules is incorporated is somewhat less clear because the CAA allows for TMST to select arbitration rules from among the AAA, NASD, The New York Stock Exchange, Inc. (or any other exchange to which Goldman Sachs belongs), or The Municipal Securities Rulemaking Board.[4] (ECF No. 25, Exh. 5, § 13.) Nonetheless, each of the bodies of rules named in the CAA contains provisions submitting the question of arbitrability to arbitration.[5] Combined with the broad language of the CAA's arbitration provision, the court finds that there is clear and unmistakable evidence that TMST and Goldman Sachs intended to submit the question of arbitrability to the arbitrator.[6]

---

[4] The CAA provides that "[i]f [TMST] does not make such an election by registered mail addressed to [Goldman Sachs] . . . within ten days after receipt of notification from [Goldman Sachs] requesting such election, then [TMST] authorizes [Goldman Sachs] to make such election on [its] behalf." (ECF No. 25, Exh. 5, § 13.) The record is silent as to whether TMST elected a body of arbitration rules or whether Goldman Sachs requested that it do so.

[5] As noted, New York courts have held that incorporation of the AAA rules constitutes important evidence that the parties intended to "leave the question of arbitrability to the arbitrators." *Life Receivables Trust v. Goshawk Syndicate 102 at Lloyd's*, 888 N.Y.S.2d 458, 459 (2009) *aff'd*, 14 N.Y.3d 850 (2010). *Sacharow* reached the same conclusion with respect to the NASD Rules. *Sacharow*, 91 N.Y.2d at 47. The District Court of New Jersey has noted that Rule 621 of The New York Stock Exchange "is identical" to NASD § 35, which the Second Circuit has found to be a "clear and unmistakable expression of an agreement to leave the question of arbitrability to the arbitrators." *Bao v. Gruntal & Co., Inc.*, 942 F. Supp. 978, 981 (D.N.J. 1996). Finally, The Municipal Securities Rulemaking Board Rule incorporates by reference the NASD. (ECF No. 37, p. 6.)

[6] .

The court notes that the Fourth Circuit appears to have imposed a more exacting standard than the Second Circuit with respect to the presumption of judicial determination of arbitrability. The Fourth Circuit has rejected the notion that broad arbitration clauses alone reflect "clear and unmistakable" evidence that the parties intended to submit the question of arbitrability to arbitration. *See, e.g., Carson v. Giant Food*, 175 F.3d 325, 330 (4th Cir. 1999) ("[I]f contracting parties wish to let an arbitrator determine the scope of his own jurisdiction, they must indicate that intent in a clear and specific manner. Expansive general arbitration clauses will not suffice to force the arbitration of arbitrability disputes."). The Fourth Circuit has not ruled on the significance of the incorporation of arbitral rules that grant authority to decide arbitrability to arbitrators, and the district courts are split on the issue. *Compare Sys. Research & Applications Corp. v. Rohde & Schwarz Fed. Sys., Inc*., 2012 WL 12785 *5 (E.D. Va. Jan. 4, 2012) (endorsing "the rule adopted by a majority of federal courts . . . that the incorporation of AAA Rules into a contract clearly and unmistakably vests the arbitrator, and not the district court, with authority to decide which issues are subject to arbitration.") (internal quotations omitted) *with Diesselhorst v. Munsey Bldg., L.L.L.P.*, 2005 WL 327532 *4 (D. Md. Feb. 9, 2005) ("That the parties agreed to arbitrate in accordance with the AAA Rules, which provide that '[t]he arbitrator shall have the power to rule on his or her own jurisdiction,' . . . does not confer authority on the arbitrator to decide which claims are arbitrable.").

For reasons already stated, the court applies New York law to the questions in this case. If the court *were* to apply federal law, however, the court would nonetheless grant Goldman Sachs's motion to compel arbitration and stay the action pending arbitration. Even if the court concluded that under Fourth Circuit law, the parties had not overcome the presumption of judicial determination of arbitrability through the CAA's broad language and incorporation of

arbitral rules submitting arbitrability to arbitration, the court would reach the issue of arbitrability and find that the CAA's arbitration clause was valid and applicable to TMST's claims. The Fourth Circuit has held at a "broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a significant relationship exists between the asserted claims and the contract in which the arbitration clause is contained." *Long v. Silver*, 248 F.3d 309, 316 (4th Cir. 2001) (internal quotations omitted). In this case, there is no question that TMST's claims have a "significant relationship" to the CAA, which explicitly applies to *any* of TMST's accounts and *all* of its transactions with Goldman Sachs

In summary, the court concludes that the arbitration provision of the CAA is valid and sufficiently evinces the parties' intent to submit the question of arbitrability to the arbitrator. Accordingly, the court will grant Goldman Sachs's motion to compel arbitration and stay the matter pending arbitration.[7]

A separate order follows.

April 19, 2012 ______________/s/______
Date Catherine C. Blake
United States District Judge

[7] The Fourth Circuit has recently noted some lack of clarity in the case law regarding whether courts should stay or dismiss actions that are sent to arbitration:

> There may be some tension between our decision in *Hooters*—indicating that a stay is required when the arbitration agreement 'covers the matter in dispute'—and *Choice Hotels*—sanctioning dismissal 'when all of the issues presented ... are arbitrable.' Our sister circuits are divided on whether a district court has discretion to dismiss rather than stay an action subject to arbitration.

*Aggarao v. MOL Ship Mgmt. Co., Ltd.*, -- F.3d --, 2012 WL 887595 *14-15 and n.18 (4th Cir. 2012) (citing *Hooters of Am., Inc. v. Phillips*, 173 F.3d 933, 937 (4th Cir. 1999), and *Choice Hotels Int'l, Inc. v. BSR Tropicana Resort, Inc.*, 252 F.3d 707, 709-10 (4th Cir. 2001)). Importantly, *Choice Hotels* prescribes the dismissal of actions where the district court finds *all* claims to be arbitrable. In this case, the court has found that the arbitrator should decide whether TMST's claims are arbitrable. Therefore, the court will stay the action rather than dismiss it while the arbitrator makes that determination.